UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JMA VENTURES, LLC and THE
ROXBOROUGH GROUP, LLC,

                Plaintiffs,

v.

STARWOOD HOTELS and RESORTS
WORLDWIDE INC.,

                Defendants.

**16 Civ. 08092 (AJN)**

**ECF CASE**

## AMENDED COMPLAINT

Plaintiffs JMA Ventures, LLC and The Roxborough Group, LLC ("Plaintiffs"), by and through their attorneys, states as follows:

### NATURE OF THE ACTION

1. Starwood Hotels and Resorts Worldwide Inc. negotiated in bad faith with Plaintiffs and engaged in fraud during negotiations for Starwood's sale—and Plaintiffs' purchase—of the St. Regis Hotel in San Francisco, California.

2. In early 2014, JMA Ventures, Roxborough, and Starwood set out the key terms of a deal for Plaintiffs to purchase the St. Regis Hotel in San Francisco, which Starwood owned.

3. The parties agreed on and signed a Letter of Intent and Term Sheet for the purchase of the St. Regis Hotel that included a specific purchase price.

4. The Letter of Intent and Term Sheet are a binding preliminary agreement, specifying that any "Definitive Agreements . . . shall include the terms set forth in the Term Sheet and such other terms as agreed to by the parties that are consistent with this Letter of Intent."

5. For more than a year, the parties negotiated language for the final set of

1

agreements. For more than a year, the purchase price remained constant.[1]

6. In late 2014, the parties exchanged near-final drafts, going so far as to circulate signature pages and discuss holding them in escrow.

7. In 2015, negotiations broke down.

8. In February 2015, Loews Hotels & Resorts announced that it would purchase the Mandarin Oriental Hotel in San Francisco. Also around this time, Starwood's CEO resigned and Starwood appointed a new CEO. Starwood began renegotiating the price term the parties had already agreed on more than a year earlier.

9. Starwood demanded more and more money despite the parties' long-standing agreement on sale price and despite the parties' binding preliminary agreement that any "Definitive Agreements . . . shall include the terms set forth in the Term Sheet," including the purchase price. Starwood insisted on three separate price increases, which in total represented an increase of more than ▇ from the original purchase price. This was in addition to an eleventh-hour demand to participate in Plaintiffs' future profits.

10. These demands were not good faith negotiation. In fact, whenever Plaintiffs agreed to Starwood's increasing price demands, Starwood raised the price further. Although JMA Ventures and Roxborough agreed to each of Starwood's price increases, Starwood itself ultimately cut off negotiations stating that it no longer wished to sell the St. Regis Hotel.

11. Starwood's behavior indicates that the price increases were not good faith attempts to get the deal done, but rather fraudulent offers that Starwood knew it would not accept, designed to induce JMA Ventures and Roxborough to keep upping the price and to agree that Starwood was negotiating in good faith while, in fact, it was backing out of the deal.

12. In December 2016, numerous news outlets reported that Starwood sold the St. Regis Hotel to The Qatar Investment Authority for approximately ▇ more than the price it

---

[1] The parties negotiated terms such as responsibility for paying of the transfer tax and certain holdbacks—portions of the purchase price specifically carved out for the seller to address repairs or improvements—which relate to price, but do not change the effective purchase price.

originally offered to Plaintiffs and approximately ▇ more than Starwood's last offer to Plaintiffs.

## THE PARTIES

13.    JMA Ventures, LLC is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.  It is a real estate and leisure-lifestyle asset investment and development firm.

14.    The Roxborough Group, LLC is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.  It is a real estate investment firm.

15.    On information and belief, Starwood is a Maryland corporation with its principal place of business in Stamford, Connecticut.  It is a hotel and leisure company.

## JURISDICTION AND VENUE

16.    This is an action for fraud and breach of the covenant to negotiate in good faith. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a) because there is complete diversity among the parties.  Plaintiffs are Delaware companies with their principal places of business in San Francisco, California.  Defendant Starwood is a Maryland Corporation with its principal place of business in Stamford, Connecticut.

17.    This Court has personal jurisdiction over Starwood because Starwood has consented to jurisdiction in this District.  Starwood filed a motion to transfer venue to this District.

18.    Venue is proper in this District pursuant to: 28 U.S.C. § 1406(a) because Judge Donato, of the Northern District of California has transferred this case to this District and pursuant to 28 U.S.C. § 1391(b)(3) and because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND

19.    JMA Ventures, Roxborough, and Starwood are all sophisticated commercial real estate entities who regularly engage in hundreds of millions of dollars in real estate transactions.

### I.     THE PARTIES SIGNED A PARTICULARLY SPECIFIC LETTER OF INTENT AND TERM SHEET

20.     In February 2014, the parties exchanged the first drafts of a Letter of Intent for JMA Ventures and Roxborough to purchase the St. Regis Hotel in San Francisco from Starwood. The parties put together the draft Term Sheet approximately one month later. The parties signed the final Letter of Intent and Term Sheet on May 22, 2014.

21.     The Letter of Intent and Term Sheet were detailed. For instance, they specified a particular purchase price, which party would bear particular transaction costs, and how the parties would handle title insurance. Starwood committed to "enter negotiations to attempt to agree on and enter into the Definitive Agreements, which shall include the terms set forth in the Term Sheet and such other terms as agreed to by the parties that are consistent with this Letter of Intent." Starwood also committed not to "solicit, market, advertise, pursue or negotiate with any other party with respect to any sale, lease or other transfer of the [St. Regis] Hotel . . . ." The Letter of Intent also states that "neither party shall rely on this letter of intent, or any further discussions . . . as a commitment, offer or agreement by the other party to enter into such transaction" but rather that the letter of intent "only expresses an interest and desire of the parties to negotiate and attempt to agree on and enter into the definitive agreements for such transaction, subject to the terms set forth herein." The Letter of Intent is attached to this Complaint as Exhibit A.

22.     The Term Sheet sets the purchase price at ■■■■■■■■  The Term Sheet is attached to this Complaint as Exhibit B.

### II.     STARWOOD REPEATEDLY DELAYED NEGOTIATIONS

23.     Negotiations took much longer than expected. The Letter of Intent set a 30-day Negotiation Period, allowing for the possibility of 30-day extensions. Between June 2014 and February 2015, the parties signed nearly 20 extensions.

24.     The delays were caused by, among other factors, Starwood's failure to disclose a defect in the hotel pool and Starwood's months-long investigations into two electrical bus duct

4

(electrical conduits) explosions. Starwood knew about the defect in the pool long before it signed the Letter of Intent, but failed to disclose it, and Starwood could have conducted the investigations much more quickly than it did.

    **A.    Starwood Concealed Defects in the Hotel Pool**

25. JMA Ventures and Roxborough conducted a due diligence investigation of the St. Regis property in July 2014. During that investigation, they uncovered leaks in the pool which Starwood knew about but failed to disclose.

26. A year earlier, Starwood prepared a request for proposal to fix the leaks but did not inform JMA Ventures or Roxborough during any negotiations for the Letter of Intent or Term Sheet. Nor did it inform JMA Ventures or Roxborough at any time after the parties had signed the Letter of Intent and Term Sheet before JMA Ventures and Roxborough uncovered the defect for themselves.

27. During negotiations, Starwood recognized the error and ███████████████████████████████████████████████████████████████████████████████████████████████████

28. Similarly, Starwood failed to disclose fire and life safety deficiencies identified in a report by its consultant.

29. During negotiations, Starwood also recognized these errors ███████████████████████████████████████████████████████████████████████████████████████████████████ The Draft Definitive Agreements specifically enumerate and define the fire life safety work at issue.

30. JMA Ventures and Roxborough hired consultants and spent significant money finding a solution for the faulty pool and continued to work towards closing the deal as they had

promised they would. JMA Ventures and Roxborough also worked over several months to find solutions to the fire and life safety issues at substantial expense. Both Starwood and Starwood's eventual buyer, The Qatar Investment Authority, benefit from the substantial time and expense incurred by JMA Ventures and Roxborough for that work.

### B.  Starwood's Investigation of Electrical Bus Explosions

31. In October 2014, one of the bus ducts in the St. Regis Hotel exploded, requiring the parties to investigate further. It took Starwood more than three months to finalize their conclusions as to the cause of the explosion and the cost to fix the bus duct, at which point the Hotel had experienced a second bus duct explosion.

32. JMA Ventures and Roxborough, wanting to get the deal done and signed, repeatedly expressed an interest in closing quickly despite the physical defects in the St. Regis. To facilitate closing more quickly, JMA Ventures and Roxborough asked Starwood to indemnify them for liability related to the bus duct explosion rather than wait for the issues to be fixed. Starwood refused.

33. Starwood insisted on either fixing the problem before closing or making the repair a post-closing seller obligation.

34. The electrical explosions and Starwood's insistence on dragging out the investigation and fixing the problem before it would agree to close the deal delayed the closing by at least five months.

### III.  STARWOOD'S FRAUDULENT ASSURANCES AND BAD FAITH NEGOTIATION

35. Each time the parties extended the Negotiation Period, Starwood represented that it was negotiating in good faith. Starwood also continually assured JMA Ventures and Roxborough that it intended to move forward with the deal. Plaintiffs relied on Starwood's assurances that it was negotiating in good faith to enter into the extensions of the Negotiation Period. Neither of Starwood's assurances, however, were true. By at least February 2015, Starwood was no longer interested in coming to an agreement, and was negotiating in bad faith,

making fraudulent statements in an effort to scuttle the nearly-final deal, while appearing to move forward.

36.   As early as April 17, 2014, Cindy Potter, Vice President of Real Estate Investment Management for Starwood, emailed that "this deal has already been communicated to [the board] with their general agreement, but with the formality of an LOI the level of review will be greater."

37.   In the second half of 2014, the parties continued to act as though the sale would happen.  Starting in July 2014, JMA Ventures and Roxborough had become deeply involved in the design and planning of the Hotel renovation, including numerous discussions and meetings with designers, consultants, architects, and furniture procurement agents, culminating with a review of and revisions to the Hotel model room, a process typically reserved for owners.  As with the investigation and design of remedial measures to address the pool defects and fire and safety issues, both Starwood and Starwood's eventual buyer, The Qatar Investment Authority, continue to benefit from Plaintiffs' investment in this work today.

38.   Similarly, by September, JMA and Roxborough had been involved in discussions about staffing for the Hotel.  Starwood's Senior Vice President of Operations, Carla Murray, emailed JMA and Roxborough to say "I know you have been in conversation [sic] finalizing the St. Regis San Francisco transaction and look forward to working more closely with you and the rest of your team and JMA.  Cindy [Potter] has updated me on your desire to change some of the EC leadership shortly after the transaction is completed.  Bob [Hermany, Chief of North American Operations] and I would like to come [sic] San Francisco and chat with you about your thoughts."  Starwood even shared a confidential general manager performance scorecard in the context of these discussions.

39.   In October, the parties' lawyers exchanged near-final versions of a purchase and sale agreement and a hotel management agreement.  The negotiations were so close to final, that JMA Ventures and Roxborough disclosed their lender and allowed Starwood to have direct communications and negotiations with the lender on non-disturbance agreements where the

7

lender and Starwood would both be parties, incurring substantial fees and expenses as a result.

40. Starwood knew that JMA Ventures and Roxborough were paying significant money to their lender to finalize closing documents, including reimbursement of legal expenses. The loan documents were nearly final and ready to close. The fact that Starwood allowed JMA Ventures and Roxborough to progress to nearly final loan documents with their lender (and their counsel) indicated that Starwood intended to close the deal, or that Starwood intended JMA Ventures and Roxborough to believe it would close the deal. JMA Ventures and Roxborough would not have continued using and paying for the lawyers and lenders services if they did not think Starwood intended to go through with the deal and if Starwood had not continued encouraging JMA Ventures and Roxborough to prepare for closing.

41. When JMA Ventures and Roxborough raised concerns regarding the amount of time and money they were spending to resolve issues such as the pool defects, fire and safety deficiencies, and electrical explosions, Starwood told Plaintiffs not to worry and that Starwood was focused on closing the transaction.

42. When JMA Ventures and Roxborough raised concerns about whether Starwood's board would approve the deal in light of the delays, Cindy Potter of Starwood assured Plaintiffs that the board was aware of the issues and continued to support the transaction.

43. On November 12, 2014, Cindy Potter responded to JMA Ventures and Roxborough's concerns with an email stating: "We've got it mainly drafted, so it won't be a long process to getting it signed. . . . Trust me SLT [Simon Turner, President of Global Development for Starwood] wants it signed." In December 2014, Starwood sent out estoppels to two third parties and tenants, purportedly to facilitate closing the sale of the St. Regis Hotel to Plaintiffs. JMA Ventures and Roxborough relied on Starwood sending out estoppels as assurance that Starwood intended to close the deal, but it appears Starwood did not intend to close the deal, but may only have intended that Plaintiffs believe Starwood intended to close the deal.

44. By January 2015, the parties also had an operating agreement that they were ready

to sign. Starwood passed along its new laundry contract, and asked JMA Ventures and Roxborough to approve it "[b]ecause this contract will impact your ownership." And on January 26, Mr. Chapman, CEO of JMA Ventures, had lunch with Starwood's then-CEO, Fritz Von Paasschen, along with other Starwood executives, during which Mr. Von Passchen gave assurances that Starwood was excited to get the deal done and that they wanted to work on more transactions together.

45. Around this time, Fritz Von Paasschen decided to resign and Starwood appointed an interim CEO, Adam Aaron, a member of Starwood's Board of Directors. Also around this time, Starwood's negotiation tactics changed dramatically.

46. On January 31, 2015, only a few days after Cindy Potter's and Fritz Von Paaschen's assurances that Starwood intended to go through with the deal, Cindy Potter informed JMA Ventures and Roxborough that "we have conditional approvals only," and that Starwood still needed "senior leadership approval" before board approval. This contradicted her previous statements that Simon Turner "wants it signed" and that the board was aware of and supported the deal, and therefore came as a surprise to Plaintiffs.

47. In February 2015, Loews Hotels & Resorts officially announced that it would purchase the Mandarin Oriental Hotel in San Francisco. Also around this time, Starwood began to try to back out of and renegotiate the price term the parties had already agreed on more than a year earlier.

48. On February 9, 2015, Starwood's Cindy Potter and Simon Turner had a phone call with Marc Perrin during which Starwood demanded that JMA Ventures and Roxborough pay an additional ███████ before Starwood would agree to go through with the deal.

49. Simon Turner acknowledged that JMA Ventures and Roxborough would not likely be able to borrow more money from their lender or have their capital partner invest additional equity, so Mr. Turner said Starwood was willing to discuss providing preferred equity to JMA and Roxborough so that they could maintain their equity returns in light of the increased purchase price. Cindy Potter agreed to prepare a preferred equity term sheet for JMA Ventures

9

and Roxborough.

50. JMA Ventures and Roxborough reluctantly agreed to the higher purchase price in an effort to close the deal.

51. After JMA Ventures and Roxborough agreed, Starwood raised the price again, demanding another ███████, for a total purchase price of ███████. That is ███████ more than the agreed-upon price listed in the Term Sheet, despite the fact that Starwood had agreed that the "Definitive Agreements . . . *shall* include the terms set forth in the Term Sheet and such other terms as agreed to by the parties that are *consistent with this Letter of Intent*." (emphasis added). This second demand to increase the purchase price occurred on a February 27, 2015 phone call with Simon Turner and Cindy Potter.

52. Again, JMA Ventures and Roxborough reluctantly agreed to the higher purchase price in an effort to close the deal.

53. But again, Starwood raised the price. On a March 13, 2015 phone call with Cindy Potter and Simon Turner, *in addition* to the ████████████████████████████████████████████████████████████████.

54. After this last price increase, JMA Ventures and Roxborough refused to sign an extension of the Negotiation Period, which stated that Starwood was continuing to negotiate in good faith. Nevertheless, the parties agreed to continue negotiating. JMA Ventures and Roxborough sent an offer letter to Starwood, *again agreeing* to Starwood's increased demand, including ████████████████████████████████████████.

55. However, on April 10, 2015, Simon Turner informed JMA Ventures and Roxborough that Starwood would not be willing to reach a deal because Starwood's new CEO, Adam Aron, had decided he did not want to sell.

56. These statements regarding price increases and approvals made clear that Starwood had ceased negotiating in good faith and that it had not intended of fulfill its assurances to Plaintiffs when it made them.

57. Starwood contended that its demands to increase the purchase price were the

10

result of changes in the market condition over the course of negotiations. Yet the delays in negotiations that took so long that market conditions changed were the result of Starwood's own failure to disclose known defects in the Hotel and unreasonably long investigations. Moreover, Starwood had already agreed to a purchase price of ▮▮▮▮▮▮▮▮ in a binding preliminary agreement.

58. It is apparent from Starwood's actions that it had no intention of respecting the price increases it demanded, even at the time it made those demands. Whenever Plaintiffs agreed to Starwood's price, Starwood raised it again. These were not sincere efforts to reach a deal, but rather bad faith misrepresentations intended to scuttle the deal while taking advantage of Plaintiffs' investment in performing due diligence for several of the Hotel's physical deficiencies and planning improvements to the hotel, which it had shared with Starwood.

59. This is further confirmed by the fact that Starwood did sell the St. Regis Hotel to a different company. In early December 2016, numerous news sources reported that Starwood sold the St. Regis Hotel to The Qatar Investment Authority for $175 million. The fact that Starwood ultimately agreed to sell the St. Regis Hotel contradicts Simon Turner's April 10, 2015 statement that Starwood's CEO, Adam Aron, simply did not want to sell the hotel at all.

## IV.     HARM TO JMA VENTURES AND ROXBOROUGH

60. During the negotiations period, JMA Ventures and Roxborough spent substantial money and time working with construction and design consultants on a capital program to improve the St. Regis Hotel. Plaintiffs would not have spent that time or money if it knew Starwood did not intend to close the deal. Starwood and The Qatar Investment Authority benefit from this money and effort Plaintiffs would not have contributed if it were not for Starwood's misrepresentations and bad faith negotiation. That is unjust enrichment.

61. JMA Ventures and Roxbourough also spent substantial money to determine solutions to the pool and fire safety defects in the St. Regis Hotel. Plaintiffs would not have spent that time or money if it knew Starwood did not intend to close the deal. Starwood and The Qatar Investment Authority benefit from this money and effort Plaintiffs would not have

11

contributed if it were not for Starwood's misrepresentations and bad faith negotiation. That, too, is unjust enrichment.

62. Throughout this entire period, significant amounts of Plaintiffs' capital were tied up, and that generated additional costs. As is common in contract negotiations, such as this one, the purchase price was to be financed through a combination of debt and equity. JMA Ventures and Roxborough also spent millions of dollars in expenses negotiating, investigating, and investing in a deal, which Plaintiffs later discovered Starwood did not intend to consummate. JMA Ventures and Roxborough would not have tied up or spent this money if they knew that Starwood was negotiating in bad faith and fraudulently misrepresenting its intentions.

63. The Term Sheet addresses ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

64. However, because of Starwood's bad faith negotiation, the parties never signed Definitive Agreements for presentation to Starwood's Board of Directors. Therefore, this Section of the Term Sheet never became relevant.

65. Starwood's fraudulent statements and failure to negotiate in good faith directly caused the deal to fail. Starwood continued to be willing to sell the St. Regis Hotel. Indeed, after Starwood cut off negotiations with Plaintiffs, it entered into negotiations with, at least, The Qatar Investment Authority, and ultimately did sell the St. Regis Hotel.

66. Starwood, JMA Ventures, and Roxborough were so close to closing the deal, it is clear that if it were not for Starwood's fraudulent statements and failure to negotiate in good

faith, the parties would have closed the deal and JMA Ventures and Roxborough would be receiving the profit from running and owning the St. Regis Hotel in San Francisco.

## COUNT ONE
*(Breach of the Covenant to Negotiate in Good Faith)*

67. Plaintiffs incorporate by reference each of the preceding paragraphs.

68. Starwood, JMA Ventures, and Roxborough entered into an enforceable preliminary agreement, covering and agreeing to the important economic terms of a deal for Starwood to sell the St. Regis Hotel in San Francisco to JMA Ventures and Roxborough. This agreement included a Letter of Intent, a Term Sheet, and numerous extensions of the Negotiation Period. Starwood also represented that it would negotiate in good faith.

69. The parties' preliminary agreement demonstrates an intent to be bound by the language of the agreement. It sets out the important economic terms of the deal, including the purchase price. It also states that any Definitive agreement "*shall* include the terms set forth in the Term Sheet" (emphasis added) and that any "other terms" must be "consistent with this Letter of Intent." Moreover, the offer letter, which Starwood drafted, includes a signature block under the words "ACCEPTED AND AGREED BY." Nor is this the only terminology in the Letter of Intent indicative of a binding contract. Starwood also signed numerous extensions of the Negotiation Period, under the words "ACCEPTED AND AGREED."

70. The Letter of Intent, Term Sheet, and extensions are replete with the terminology of binding contracts, including setting forth governing law, confidentiality obligations, due diligence obligations, and even survival of certain terms beyond the termination of the agreement.

71. The context of the negotiations also demonstrates that the parties entered into an enforceable preliminary agreement. The parties negotiated the Letter of Intent and Term Sheet for months, with both sides represented by experienced counsel.

72. Although the Letter of Intent and Term Sheet leave open terms, they set out the critical terms for the sale of the St. Regis Hotel including the purchase price, the parties, a

definition of the property and property interest, due diligence obligations, as well as title and survey.

73. The parties also partially performed on their agreement. Starwood began to include JMA Ventures and Roxborough in the design and planning of the renovation for the Hotel, as well as plans for changing staffing after the parties closed the deal. Starwood even shared confidential performance scorecards and new laundry agreements with JMA Ventures and Roxborough because they would be important after the change in ownership. JMA Ventures and Roxborough disclosed their lender and allowed Starwood to have direct communications with the lender. The parties even had a 50-year operating agreement for the Hotel that they were ready to sign.

74. The Letter of Intent, Term Sheet, and extensions are a common first step in complex commercial transactions such as this one. This Letter of Intent and Term Sheet, however, are much more specific than most.

75. Starwood entered into an enforceable preliminary agreement, including a commitment to negotiate in good faith based on the terms set out in the Letter of Intent and Term Sheet. It was therefore precluded from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

76. Starwood breached that agreement in many ways.

77. It failed to disclose serious defects it was aware of prior to the start of—or during—negotiations, such as the defects in the pool and the fire and safety deficiencies.

78. Starwood also assured JMA and Roxborough that the parties were in general agreement that the Starwood Board of Directors was informed of the transaction and in support of it, and that senior personnel such as Simon Turner wanted to get the deal done. However, those assurances proved to be false. Starwood later declared that its new CEO would not agree to the deal and attempted to raise the agreed upon price not once, but three times.

79. Starwood's behavior—including, but not limited to, increasing the price each time JMA Ventures and Roxborough agreed to a new demand—indicates that the price increases were

not good faith attempts to get the deal done, but rather fraudulent offers Starwood knew it would not accept designed to induce JMA Ventures and Roxborough to back out of the deal.

80. The parties failed to close the deal as a direct result of Starwood's breach of the covenant to negotiate in good faith.

81. As a result of Starwood's breach, JMA Ventures and Roxborough have been damaged in the amount of their investment in the redesign, capital program, and repair designs, through which Starwood has been unjustly enriched, expenses in negotiation and preparation for the sale closing, and lost profits and expectation damages for the failure of the deal.

### COUNT TWO
*(Fraud)*

82. Plaintiffs incorporate by reference each of the preceding paragraphs.

83. Starwood made material misrepresentations and omissions of fact to JMA Ventures and Roxborough during negotiations for the Definitive Agreements over the sale of the St. Regis Hotel in San Francisco, which Starwood knew to be false, in an effort to induce JMA Ventures and Roxborough to rely on those misrepresentations and omissions. JMA Ventures did reasonably rely on those representations, and as a result sustained significant damages.

84. After entering into the Letter of Intent and Term Sheet, Starwood provided numerous false assurances to JMA Ventures and Roxborough that Starwood was in general agreement with the Definitive Agreements; that Starwood's board was informed of the transaction and in support of it; and that senior personnel wanted to get the deal done. These representations were false. In fact, Starwood negotiated in bad faith with the intent not to approve the deal. Starwood's actions indicate that it intended JMA Ventures and Roxborough to rely on these false assurances. JMA Ventures and Roxborough did reasonably rely on these false assurances and sustained damages in the form of expenditures on designing a capital campaign, due diligence, staffing redesign, hotel redesign and many other improvements that have unjustly enriched Starwood. JMA Ventures and Roxborough have also sustained damages as a result of these misrepresentations in the form of expenses in continuing negotiations that Starwood had no

intent of consummating.  These misrepresentations also delayed the deal, which is, in part, responsible for Starwood beginning to negotiate in bad faith, leading to JMA Ventures and Roxborough's lost profits.

85. Starwood's price increases were also material misrepresentations of fact. Starwood communicated increasing price demands to JMA Ventures and Roxborough.  Each time, JMA Ventures and Roxborough accepted Starwood's higher price, but Starwood refused to accept the deal it had, itself, proposed.  This conduct demonstrates that Starwood did not intend to accept the purchase prices it offered.  It therefore made these false representations knowingly. Starwood intended that JMA Ventures and Roxborough would rely on the apparent sincerity of Starwood's offers, and, in fact, JMA Ventures and Roxborough did reasonably rely on Starwood's misrepresentations.  JMA Ventures and Roxborough sustained damages in the form of expenditures on designing a capital campaign, due diligence, staffing redesign, hotel redesign and many other improvements that have unjustly enriched Starwood.  JMA Ventures and Roxborough have also sustained damages as a result of these misrepresentations in the form of expenses in continuing negotiations that Starwood had no intent of consummating.  These misrepresentations also delayed the deal, which is, in part, responsible for Starwood beginning to negotiate in bad faith, leading to JMA Ventures and Roxborogh's lost profits.

86. Starwood also represented that it would negotiate in good faith.  For the reasons described above, in Count One, that representation was false.  Starwood's actions indicate that Starwood knew it was not negotiating in good faith and intended to induce JMA Ventures and Roxborough to continue negotiations in reliance on Starwood's misrepresentations.  JMA Ventures and Roxborough did reasonably rely on Starwood's misrepresentations and sustained damages in the form of expenditures on designing a capital campaign, due diligence, staffing redesign, hotel redesign and many other improvements that have unjustly enriched Starwood. JMA Ventures and Roxborough have also sustained damages as a result of these misrepresentations in the form of expenses in continuing negotiations that Starwood had no intent of consummating.  These misrepresentations also delayed the deal, which is, in part,

responsible for Starwood beginning to negotiate in bad faith, leading to JMA Ventures and Roxborough's lost profits.

87. As a result of Starwood's fraud, JMA Ventures and Roxborough have been damaged in the amount of their investment in the redesign and capital program through which Starwood has been unjustly enriched, expenses in negotiation and preparation for the sale closing, and lost profits and expectation damages for the failure of the deal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. Declaration that Starwood breached its covenant to negotiate in good faith,

2. Declaration that but for Starwood's bad faith negotiation, the parties would have closed the deal to sell the St. Regis Hotel in San Francisco to JMA Ventures and Roxborough,

3. Declaration that Starwood engaged in fraud toward JMA Ventures and Roxborough,

4. Declaration that Starwood was unjustly enriched,

5. An order requiring Starwood to disgorge its unjust enrichment,

6. An order requiring Starwood to reimburse all of Plaintiffs' costs in negotiating this deal,

7. An order requiring Starwood to pay Plaintiffs' lost profits and expectation damages, and

8. Orders granting such other and further relief as the Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demands a trial by jury of all issues triable of right by a jury in the above-captioned case.

Dated:  January 23, 2017						DURIE TANGRI LLP


							By: 			*/s/ Michael A. Feldman*
								JOSHUA H. LERNER
								MICHAEL A. FELDMAN

							DURIE TANGRI LLP
							JOSHUA H. LERNER (*Pro Hac Vice*)
							jlerner@durietangri.com
							MICHAEL A. FELDMAN (*Pro Hac Vice*)
							mfeldman@durietangri.com
							217 Leidesdorff Street
							San Francisco, CA  94111
							Telephone:	415-362-6666
							Facsimile:	415-236-6300

							Attorneys for Plaintiffs
							JMA VENTURES, LLC and
							THE ROXBOROUGH GROUP, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2017 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

> */s/ Michael A. Feldman*
> JOSHUA H. LERNER
> MICHAEL A. FELDMAN